**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**BLUEFIELD DIVISION**

**TOMMI ROMANELLO,**

     **Plaintiff,**

**v.**                                                                 **Civil Action No. 1:18-cv-00889**

**ANDREW SAUL,[1]**
**COMMISSIONER OF SOCIAL SECURITY,**

     **Defendant.**


## <u>PROPOSED FINDINGS AND RECOMMENDATION</u>

Plaintiff Tommi Romanello ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33.  By standing order entered on January 4, 2016, and filed in this case on May 4, 2018, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  (ECF No. 4.)  Presently pending before this Court are Claimant's Brief in Support of Complaint and Motion for Judgment on the Pleadings (ECF No. 8) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 9).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Claimant's request for

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d).  *See also* 42 U.S.C. § 405(g) (stating that action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

judgment on the pleadings (ECF No. 8), **GRANT** the Commissioner's request to affirm his decision (ECF No. 9), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 33 years old at the time of her alleged disability onset date and 37 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (Tr. at 35.)[2] She is a high school graduate with additional training as a licensed practical nurse. (*Id.*) Most recently, she worked as a home health aide, and she has also been employed as a bank teller, waitress, and charge nurse. (*Id.* at 34.) Claimant alleges that she became disabled on February 14, 2013, due to injuries to her back, knees, and left heel/ankle, as well as hypertension, depression, heart palpitations, carpal tunnel syndrome, morbid obesity, and hypothyroidism. (*Id.* at 254–55, 286.)

Claimant protectively filed her application for benefits on March 6, 2014. (*Id.* at 254–55.) Her claim was initially denied on August 15, 2014, and again upon reconsideration on January 12, 2015. (*Id.* at 122–26, 128–30.) Thereafter, on March 12, 2015, Claimant filed a written request for hearing. (*Id.* at 131–32.) An administrative hearing was held before an ALJ on April 25, 2017, in Roanoke, Virginia. (*Id.* at 43–93.) On June 23, 2017, the ALJ entered an unfavorable decision. (*Id.* at 12–42.) Claimant then sought review of the ALJ's decision by the Appeals Council on July 10, 2017. (*Id.* at 248–50.) The Appeals Council denied Claimant's request for review on March 12, 2018, and the ALJ's decision became the final decision of the Commissioner on that date. (*Id.* at 1–6.)

---

[2] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 7.

Claimant timely brought the present action on May 3, 2018, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).  (ECF No. 1.)  The Commissioner filed an Answer (ECF No. 6) and a transcript of the administrative proceedings (ECF No. 7).  Claimant subsequently filed her Brief in Support of Complaint and Motion for Judgment on the Pleadings (ECF No. 8), and in response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 9).  As such, this matter is fully briefed and ready for resolution.

B.  *Relevant Medical Evidence*

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

1.  *Treatment for Back Pain*

Claimant presented to the emergency room at Bluefield Regional Medical Center on August 2, 2012, after an automobile accident.  (Tr. at 805–60.)  She described pain in her neck, lower back, and left hip.  (*Id.* at 807.)  An x-ray noted an "old" "compression fracture of L1 and L2" vertebrae in Claimant's spine.  (*Id.* at 813.)  Claimant was discharged the same day with medication.  (*Id.* at 810.)  The following day, she presented to her primary care physician, S.K. Shammaa, M.D. ("Dr. Shammaa"), and was diagnosed with lumbrosacral and neck sprains.  (*Id.* at 704–05.)  Claimant returned to Dr. Shammaa several times over the following months to obtain prescription refills.  (*See id.* at 706–08.)

On June 14, 2015, Claimant underwent an x-ray on her lumbar spine.  (*Id.* at 899.)  The radiologist noted "Degenerative changes at T12-L1, L1-L2 and L5-S1 level with narrowed disc spaced and endplate spurring.  No acute fracture.  Mild old compression of L1 vertebra."  (*Id.*)

Claimant presented to Dr. Shaamaa on May 12, August 31, and December 8, 2016, complaining of low back pain.  (*Id.* at 882–87.)

### 2. Treatment for Knee Pain

Claimant presented to Dr. Shammaa on February 16, 2013, after she slipped and injured her left knee at work two days earlier. (*Id.* at 717.) Dr. Shammaa noted tenderness and swelling in the knee, and Claimant had a positive McMurray test. (*Id.*) A later MRI revealed a meniscus tear. (*Id.* at 709–10.) Claimant continued to present to Dr. Shammaa with knee pain over the following months. (*See id.* at 718–24.)

On May 24, 2013, Claimant presented to Dr. S. Brett Whitfield, M.D. ("Dr. Whitfield"), an orthopedic surgeon. (*Id.* at 693–96.) Dr. Whitfield noted that Claimant had participated in physical therapy for her knee for "approximately four weeks," but it "did not help very much." (*Id.* at 693.) His physical examination of Claimant's left knee revealed "[m]ild suprapatellar effusion," joint tenderness, and a positive McMurray test. (*Id.* at 694.) Dr. Whitfield diagnosed Claimant with "Grade II ACL strain with intact fibers" and "Suprapatellar effusion" in addition to the meniscus tear. (*Id.* at 695.) He recommended surgery to repair the meniscus tear and instructed Claimant to wear a knee brace to prevent her knee from "giving way." (*Id.*)

Dr. Whitfield performed surgery on Claimant's left knee on July 31, 2013. (*Id.* at 476–77.) At a follow-up appointment on August 15, 2013, he noted that Claimant's knee was "well healed" and had a full range of motion, and he recommended physical therapy. (*Id.* at 692.) At Claimant's next appointment on September 17, 2013, Claimant reported "pain and clicking in the left knee" and "difficulty with long periods of standing and walking." (*Id.* at 691.) Dr. Whitfield determined that Claimant "is improving but is not there as of yet" and that "her BMI has a lot of [e]ffect on her recovery." (*Id.*) Over the following months, Claimant continued to complain to Dr. Shammaa and Dr. Whitfield about her knee pain. (*Id.* at 688–89, 728–39.)

On December 5, 2013, Claimant presented to Dr. Shammaa and reported pain in her knees and ankles. (*Id.* at 771–74.) Dr. Shammaa noted tenderness and swelling in her left knee. (*Id.* at

774.)  Claimant again complained to Dr. Shammaa of pain in both knees and in her left heel on April 14 and July 11, 2014.  (*Id.* at 767–69.)  On October 26, 2014, Claimant underwent an MRI on her right knee, which revealed "Small knee effusion.  No acute fracture or dislocation of the knee.  Visible focal tear of the anteromedial aspect of the anterior horn of the lateral meniscus associated with a cyst formation or a small hematoma."  (*Id.* at 900.)

On September 23, 2015, Claimant presented to Dr. Shammaa with calf pain and bruising in her right knee and calf, and she was concerned that she had a blood clot.  (*Id.* at 890.)  She underwent an ultrasound that revealed "[n]o evidence of deep venous thrombosis."  (*Id.* at 898.)

Claimant again reported knee pain to Dr. Shammaa on August 31, 2016.  (*Id.* at 884–85.)

3.  *Consultative Physical Examination: Dr. Kip Beard, M.D.*

Dr. Kip Beard, M.D. ("Dr. Beard") examined Claimant on July 21, 2014.  (*Id.* at 756.)  Claimant complained of "back and joint injuries, heart palpitations, and carpal tunnel."  (*Id.*)  Dr. Beard observed that Claimant "ambulated slowly and limped mildly on the left" and used a cane, although "[s]he was able to ambulate without the use of a cane."  (*Id.* at 759.)  He noted that Claimant "could stand unassisted" and "seemed to be able to arise from a seat without difficulty when climbing up and down from the examination table," but "[s]he verbalized discomfort and exhibited a mild degree of difficulty."  (*Id.*)  Claimant "seemed comfortable seated" but had "back discomfort" when "supine."  (*Id.*)

With respect to Claimant's back, Dr. Beard's examination "revealed some pain associated range of motion loss, negative-appearing straight leg raising, and no obvious neurologic compromise."  (*Id.* at 761.)  His examination of her knees "revealed some motion abnormalities with discomfort evidence of prior surgery" but "[n]o inflammatory arthritis."  (*Id.*)  However, Dr. Beard's examination of Claimant's lower extremities was limited by Claimant's refusal "to allow palpation of the knees . . . because of reported pain and tenderness" or "to allow deep tendon reflex

testing." (*Id.* at 760.) Dr. Beard also noted "some issues with [Claimant's] effort" when performing the requested tasks. (*Id.* at 761.)

### 4. Mental Health Treatment

Claimant presented to the outpatient mental health clinic at Seneca Health Services, Inc., ("Seneca Health") on July 16, 2015,[3] after being referred by Dr. Shammaa "due to ongoing and longstanding depression and anxiety." (*Id.* at 791, 866.) Margaret Bruns ("Ms. Bruns"), a nurse practitioner at Seneca Health, conducted a psychiatric evaluation of Claimant on that date. (*Id.* at 791, 796, 866, 871.) Claimant reported "feelings of hopelessness and sometimes paranoia," as well as "some despair at times." (*Id.* at 791, 866.) She also reported "decreased libido, decreased energy level, and a decreased motivation level." (*Id.*) Claimant represented that she "has crying spells daily and is 'always on the verge of tears'" and "has trouble initiating and maintaining sleep." (*Id.*) She also represented that she "bites her nails and picks at her cuticles," "plucks hair off of her body," and "pick[s]" at her skin. (*Id.* at 791–92, 866–67.) Claimant further reported "[p]anic attacks . . . triggered by stress or going to a funeral, or from nothing whatsoever" and "suicidal ideation that comes and goes." (*Id.* at 792, 867.) Her mental status examination appears largely normal, except Ms. Bruns noted that Claimant "appears quite anxious" and had a depressed mood. (*Id.* at 795, 870.) Ms. Bruns concluded that Claimant suffered from "Major Depressive Disorder, Recurrent, Moderate" and "Anxiety Disorder." (*Id.* at 796, 871.)

Claimant returned to Seneca Health on August 6, 2015, for a "Routine Follow-up" with Ms. Bruns. (*Id.* at 798, 876.) Ms. Bruns again noted that Claimant had a depressed mood and was anxious. (*Id.* at 798–99, 876–77.) Ms. Bruns's diagnosis remained the same, and she instructed Claimant to return to the clinic in one month. (*Id.* at 799–800, 877–78.)

---

[3] It appears that the record for this visit was created on January 22, 2016. (*See* Tr. at 791, 866.)

Claimant next returned to Seneca Health on October 5, 2015, and met with therapist Sandra Fox ("Ms. Fox"). (*Id.* at 801, 873.) Claimant complained of panic attacks, "which have occurred for the past 3 years." (*Id.* at 802, 874.) She explained that "she has a fear of leaving the house and having a panic attack in public, which is why she cancelled several appointments before coming in." (*Id.*) Claimant represented that her panic attacks occurred approximately once per week and lasted 30–60 minutes each. (*Id.*) Claimant's mental status examination was normal except that Ms. Fox noted, "Affect and mood sad and anxious." (*Id.* at 803, 875.) Ms. Fox recommended "once/month individual supportive/cognitive-behavioral psychotherapy." (*Id.*) However, Claimant was discharged from Seneca Health on July 12, 2016, because she "did not follow up with treatment." (*Id.* at 865.)

On February 17, 2017, Claimant presented to John C. Terry ("Mr. Terry"), a psychologist, for "[s]evere sadness" and anxiety. (*Id.* at 904–06.) Claimant reported feelings of restlessness, nervousness, anxiety, loneliness, and depression, as well as "[l]oss of interest," "[s]ocial withdrawal," and fear of "crowds [and] public places." (*Id.* at 904.) Mr. Terry noted that Claimant "appeared uncomfortable," "distressed," and "[t]ired," with "abnormal" speech and "[m]ild psychomotor retardation." (*Id.* at 905.) She had a "[f]lat" affect and was "tearful." (*Id.*) Mr. Terry diagnosed Claimant with "Moderate recurrent major depression," "Generalized anxiety disorder," and "Panic disorder with agoraphobia." (*Id.*) He recommended "Cognitive behavioral therapy of a pain management orientation" and "Psychoactive medication management with [Dr. Shammaa]." (*Id.* at 906.) Mr. Terry's assessment at Claimant's second appointment on March 9, 2017, was similar. (*See id.* at 902–03.)

   5.  *Consultative Psychological Examination: Judith F. Lucas, M.A.*

Judith F. Lucas, M.A. ("Ms. Lucas") examined Claimant on June 12, 2014. (*Id.* at 749.) Claimant reported to Ms. Lucas that she felt "depressed" and "worthless" and had "been depressed

daily for a couple of years." (*Id.*) She also reported that she was "nervous in a crowd, feeling shaky" but had "no panic attacks." (*Id.*) Claimant "stated that she used to be sociable but now might avoid people . . . in the grocery store." (*Id.*) She also reported "difficulty sleeping because of pain." (*Id.*)

Ms. Lucas noted that Claimant "arrived for the appointment on time" and "was clean and suitably dressed." (*Id.*) Claimant "was cooperative," "related appropriately with [Ms. Lucas]," had "[r]elevant and coherent" speech, and "was oriented in all spheres." (*Id.* at 750.) Although she "appeared depressed," her "[t]hought processes appeared logical and organized," with "no evidence of delusions, preoccupations, or obsessions" or of hallucinations. (*Id.*) Claimant reported no suicidal or homicidal ideations. (*Id.* at 751.) Ms. Lucas noted that Claimant "seemed to have fair insight" and "was able to interpret a proverb and answer a simple comprehension question." (*Id.* at 750–51.) Her memory and concentration fell "[w]ithin normal limits," although her recent memory was "[m]oderately deficient." Ms. Lucas further determined that Claimant's social functioning, persistence, and pace were "[w]ithin normal limits." (*Id.* at 751–52.) Ms. Lucas concluded that Claimant suffered from "Major Depressive Disorder with Some Characteristics of Bereavement" and "Unspecified Anxiety Disorder." (*Id.* at 751.)

## C. *Sequential Evaluation Process*

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled"

or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*,

780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e).  The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862.  "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]."  20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659.  Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria.  20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c).  "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d).  "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the

claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements and was insured through the date of the decision. (Tr. at 17.) He further determined that Claimant had not engaged in substantial gainful activity since the alleged onset of her disability. (*Id.*) He found that Claimant's "degenerative joint disease of the knee status post-surgical correction, degenerative disc disease, morbid obesity, depressive disorder, and anxiety disorder" constituted "severe" impairments. (*Id.*) However, he found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 18.) Upon assessing

11

Claimant's RFC, the ALJ determined that Claimant is able "to perform sedentary work . . . except that [she] should be allowed to briefly (defined as thirty seconds to two minutes) stand and walk after each hour of sitting," and that she "could occasionally crouch, kneel, stoop, balance, and climb ramps or stairs" but "should never crawl or climb ladders, ropes, or scaffolds." (*Id.* at 22.) In addition, the ALJ found that Claimant "should not work around extremes of heat or cold, wetness, humidity, vibration, or hazards" and "should be limited to simple, routine work in an environment with few day-to-day changes." (*Id.*)

The ALJ concluded that given the limitations imposed by the Claimant's RFC, she was unable to perform any of her past relevant work. (*Id.* at 34.) He noted that she is "a younger individual" with "at least a high school education" and that "[t]ransferability of job skills [was] not material to the determination of disability." (*Id.* at 35.) Because the ALJ determined that Claimant was unable to perform the full range of sedentary work, he enlisted a vocational expert ("VE") to aid in his finding that Claimant is capable of working as an addressing clerk, a call out operator, or a production assembler. (*Id.* at 35–36.) As a result, the ALJ concluded that Claimant was not "under a disability . . . from February 14, 2013, through the date of this decision." (*Id.* at 36.)

## II.    LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative

record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

## III.   ANALYSIS

Claimant argues that the ALJ failed to address in his opinion various functional limitations that were the subjects of hypothetical questions the ALJ presented to the VE. (ECF No. 8 at 4–8.) The Commissioner responds that the ALJ may present alternative hypotheticals to the VE and adopt the VE's answers for those hypotheticals that are supported by the medical evidence in the record. (ECF No. 9 at 11–15.)

Claimant further asserts that the ALJ erroneously assessed her credibility by discounting the symptoms of her mental impairments. (ECF No. 8 at 9–11.) The Commissioner responds that the ALJ was "not required to document specific findings regarding each of the factors bearing on subjective complaints" and that he thoroughly examined and discussed the available medical evidence relating to Claimant's mental condition. (ECF No. 9 at 15–20.)

Claimant asks this Court to reverse the Commissioner's decision and award her benefits. (*See* ECF No. 8 at 11.)

### A. Claimant's Functional Limitations

Claimant contends that the ALJ was obligated to explain whether the functional limitations posed in hypothetical questions to the VE were "consistent with the medical evidence and testimony." (*Id.* at 5.) She takes issue with hypothetical questions related to her ability to stoop

13

or crouch, the availability of an opportunity "to stand and walk briefly after each hour of sitting," and the possibility that her mental impairments would cause "being off task . . . outbursts or interfering with co-workers, absenteeism, and leaving work early or late." (*Id.* at 4–5.)

In determining whether a claimant can perform his or her past relevant work or adjust to other work, the ALJ may engage a VE to "offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s)" can perform certain work. 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2); *see id.* §§ 404.1560(c), 416.960(c). "In order for a [VE's] opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Hines v. Barnhart*, 453 F.3d 559, 566 (4th Cir. 2006) (quoting *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989)). "[A] hypothetical question is unimpeachable if it adequately reflects a [RFC] for which the ALJ had sufficient evidence." *Fisher v. Barnhart*, 181 F. App'x 359, 364 (4th Cir. 2006) (citing *Johnson*, 434 F.3d at 659) (emphasis deleted) (internal quotation marks omitted).

### 1. *Ability to Stoop or Crouch*

With respect to Claimant's ability to stoop or crouch, the ALJ first asked the VE if work were available for an individual who, in addition to other limitations, "should no more than occasionally crouch, kneel, stoop, balance, [or] climb ramps or stairs." (Tr. at 86.) The VE responded, "[T]here would be some unskilled, sedentary occupations within this hypothetical." (*Id.*) The ALJ then asked the VE about an individual "limited as I have just described except in this case this person should never stoop or crouch." (*Id.* at 87.) The VE responded that such a hypothetical "would eliminate all work activity" because "you pretty much have to stoop to be able just to sit down in a chair bending at the waist." (*Id.*) Claimant argues that her "documented

severe impairments . . . cause her to have limitations in stooping and crouching," but the ALJ failed to evaluate "whether [Claimant] can stoop or crouch in a work place setting."  (ECF No. 8 at 7.)

As an initial matter, "an ALJ is permitted to ask a VE multiple hypotheticals, even if they are contradictory, as such hypothetical questions are not findings of fact, and it is entirely permissible for the ALJ to determine after the hearing which hypothetical is supported by the record." *Woodlief v. Berryhill*, No. 5:16-CV-191-FL, 2017 WL 9478528, at *5 (E.D.N.C. Aug. 4, 2017) (citing *Davis v. Apfel*, 162 F.3d 1154 (4th Cir. 1998) (table), 1998 WL 559728, at *2; *Sizemore v. Colvin*, No. 5:15-CV-00053-MOC, 2016 WL 483140, at *4 (W.D.N.C. Feb. 5, 2016)). The ALJ did so here, stating that Claimant's RFC permitted her to "occasionally crouch" or "stoop," consistent with the first hypothetical question the ALJ asked the VE.  Although the ALJ did not specifically explain why he chose one hypothetical over the other, his assessment of Claimant's ability to crouch or stoop is adequately supported by the medical evidence described in his opinion.

The ALJ based his conclusions about Claimant's ability to stoop or crouch on the opinions of the two state consultative experts, whose opinions the ALJ accorded significant weight because they were "consistent with the record."  (Tr. at 31.)  The ALJ explained, "Although [Claimant] has received treatment for allegedly disabling impairments, that treatment has been essentially routine and conservative in nature since her knee surgery."  (*Id.* at 33.)  Indeed, as the ALJ's review of Claimant's medical records reflects, Claimant continued to report knee pain after her surgery, but aside from joint tenderness and minimal motion restrictions, her physicians' findings were largely normal.  (*Id.* at 24–31; *see id.* at 33.)  The ALJ also noted that Claimant's "last documented treatment for physical issues was for back pain in December of 2016."  (*Id.* at 33.)  Claimant's medical records indicated "a diminished range of motion and lumbosacral tenderness and pain," but Dr. Shammaa "refilled her current prescriptions" and did not recommend additional treatment.

15

(*Id.* at 30.)  The ALJ further determined that Claimant "may have been trying to exaggerate her limitations," based on her "repeated poor efforts" and failure to cooperate with Dr. Beard.  (*Id.* at 34.)  He accorded significant weight to Dr. Beard's opinion that Claimant did not need to use a cane because it was prescribed "only until she had completed physical therapy" and because "she was able to ambulate without the use of a cane during [a] physical examination."  (*Id.* at 32, 34.)  In other words, the ALJ concluded that despite Claimant's diagnoses, her corresponding functional limitations did not preclude her entirely from stooping or crouching.  *See Parsons v. Berryhill*, No. 3:18-cv-01107, 2019 WL 2252023, at *11 (S.D.W. Va. May 2, 2019) (proposed findings and recommendation of magistrate judge) ("[I]t is not enough to merely point to a medical diagnosis in order to establish disability.  Instead, Claimant must also show how that condition results in an actual functional limitation.").

Accordingly, the undersigned **FINDS** that the ALJ adequately supported his findings related to Claimant's ability to stoop or crouch by explaining the medical opinions on which he relied in making his findings and connecting those findings to the records from Claimant's treating physicians.

## 2.  *Opportunity to Stand and Walk Briefly After Each Hour of Sitting*

Claimant further asserts that the ALJ improperly failed to define the term "brief" when presenting a hypothetical question to the VE about standing and walking after each hour of sitting.  (ECF No. 8 at 5.)  In his initial hypothetical, the ALJ described an individual who "should be allowed to briefly stand and walk . . . after each hour of sitting."  (Tr. at 86.)  The VE represented that work would be available for such an individual.  (*Id.* at 86–87.)  Claimant's attorney followed up on that hypothetical by asking the VE, "So if, for example, every hour you're taking a break and sometimes it's only a couple minutes and sometimes it extends into five to ten minutes and that happens on a consistent basis, what impact is that going to have on that employment?"  (*Id.* at

88.)  The VE replied, "[A]t most I think during a workday you can be off task 10% of the workday which is 6 minutes an hour."  (*Id.*)  Claimant argues that the ALJ's "failure to provide the definition of 'brief' in the original hypothetical and in the decision is a critical error."  (ECF No. 8 at 5.)

To the contrary, the ALJ expressly defined "brief" in his RFC assessment: "[C]laimant should be allowed to briefly (defined as thirty seconds to two minutes) stand and walk after each hour of sitting."  (Tr. at 22.)  This is well below the VE's estimate that an individual may take breaks of six minutes per hour during the workday.  (*See id.* at 88.)  The VE also explained at the hearing that for the available positions he suggested, "you can stand for brief periods of time for all three of these positions and perform them."  (*Id.* at 90.)  Accordingly, because the ALJ defined the term "briefly" in his decision and the functional limitations he described did not eliminate available work consistent with the VE's testimony, the undersigned **FINDS** that Claimant's argument to the contrary is without merit.

### 3. *Assessment of Mental Impairments' Impact on Workday*

Finally, with respect to Claimant's mental impairments, the ALJ first asked the VE if work were available for an individual who, in addition to other physical limitations, "would be limited to performance of simple, routine tasks that are performed in a work environment with few day-to-day changes."  (*Id.* at 87.)  The VE replied that the jobs he identified "were all unskilled jobs and would still be within this hypothetical."  (*Id.*)  Claimant's attorney asked the VE, "[I]f she has to take regular breaks to alleviate symptoms associated with panic attacks or depression or pain and she's doing that on a consistent basis more than 10% of the time, that would eliminate work activity?"  (*Id.* at 89.)  The VE agreed that it would.  (*Id.*)  Relatedly, Claimant's attorney asked, "What tolerances are there as relate to emotional outbursts, emotional reactions such as panic attacks, things of that nature?  If those occur during the normal workday, aside from the fact that they impact your work activity and your being off task, if that happens on a consistent basis,

what impact does that have on employment?" (*Id.* at 90–91.) The VE replied, "If it impacts the work of others, coworkers because of outbursts or something, then that's going to be an issue." (*Id.* at 91.) Claimant's attorney also asked about how an individual's absenteeism would affect her ability to work, and the VE estimated that "usually you can miss a day, day-and-a-half a month with most employers," but "leaving early" or "showing up late" "five or six times a month" would "preclude work." (*Id.* at 89.) Claimant argues that because her attorney questioned the VE about these issues, the ALJ had an obligation to address them in relation to Claimant's severe mental impairments. (ECF No. 8 at 5.)

Claimant largely bases her argument on her own self-reported symptoms. (*Id.* at 8.) The ALJ accorded some weight to Claimant's subjective complaints "based on her ongoing treatment." (Tr. at 33.) In assigning "little weight" to the opinions of the two state consultative mental experts, the ALJ observed that Claimant's "treatment notes support some degree of mental limitation." (*Id.* at 31.) However, the ALJ observed that Claimant's allegations of "significant mental symptoms, such as poor memory, concentration, and social functioning," were not reflected in "the treatment notes of her treating practitioners." (*Id.* at 33.) He further noted that Claimant's physical limitations, not her psychological issues, were at the forefront of her reports to her mental health practitioners. (*Id.*) Finally, the ALJ emphasized that Claimant did not undergo "continuous treatment" for her psychological conditions and had "gaps" in treatment "of more than six months." (*Id.*) Indeed, the ALJ's review of the medical records reflects that Claimant was "discharged from mental health outpatient treatment" in July 2016 because "she 'did not follow up with treatment.'" (*Id.*) Based on this information, the ALJ concluded that Claimant's RFC limited her "to simple work where she would not have to adapt to a great deal of change, but otherwise her mental state appears to be stable." (*Id.*) The undersigned **FINDS** that the ALJ adequately explained Claimant's mental limitations that were supported by the record and

incorporated those limitations into Claimant's RFC assessment and his hypothetical question to the VE.

### B. Claimant's Credibility

Similar to the argument most recently addressed by the undersigned, Claimant asserts that the ALJ failed "to provide any rationale or reasoning for rejecting" Claimant's subjective complaints about her mental symptoms. (ECF No. 8 at 10.) To evaluate the disabling effect of an individual's symptoms, the ALJ first determines whether "objective medical evidence" supports the existence of "a condition reasonably likely to cause the [symptoms] claimed." *Hines*, 453 F.3d at 565; *see* 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). If so, the ALJ then "evaluate[s] the intensity and persistence of [the claimant's] symptoms" to "determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). An individual's subjective complaints about her symptoms are relevant to the latter determination. *See id.* §§ 404.1529(c)(3), 416.929(c)(3). Claimant points to three portions of the record that she claims support her allegations of "a much greater level of impairment than suggested by the Commissioner." (ECF No. 8 at 10.) The ALJ addressed all of this evidence in his decision.

Claimant argues that Mr. Terry "noted many mental health limitations, including increasing limitations of normal activities, interpersonal problems, and family disruption" and that the records from Seneca Health "clearly reveal significant problems, including daily crying spells, insomnia, nail biting, hair plucking, and panic attacks." (*Id.*) In his review of the medical evidence, the ALJ summarized the records from Claimant's visits to those providers and accurately noted Claimant's representations to the providers about her symptoms and the providers' reported findings. (Tr. at 29–30, 31; *see id.* at 789–804, 864–80, 902–07.) He gave weight to those findings when assigning limited weight to the opinions of the state consultative mental experts, stating, "The claimant's psychological treatment notes support some degree of mental limitation." (*Id.* at 31.)

19

However, the ALJ observed that Claimant "scheduled [her initial appointment with Mr. Terry] when the date of her hearing was nearing in February of 2017." (*Id.* at 33.) Prior to that appointment, Claimant had not been treated for mental issues since her October 5, 2015 appointment with Ms. Fox. (*Id.*; *see id.* at 801–03, 873–75.) The ALJ explained, "If [Claimant] has complained of severe mental impairments and needing cognitive behavioral therapy for her anxiety and depression, the undersigned would expect to see continuous treatment and not gaps of more than six months." (*Id.* at 33.) He also pointed to Claimant's discharge from Seneca Health and her failure to begin using prescribed medication as "evidence that [Claimant] has not been entirely compliant in following prescribed treatment, which suggest that the symptoms may not have been as limiting as [Claimant] has alleged." (*Id.*) The ALJ may consider this as a factor in assessing Claimant's credibility. *Dunn v. Colvin*, 607 F. App'x 264, 275–76 (4th Cir. 2015).

Claimant further asserts that the ALJ improperly rejected the symptoms she reported to Ms. Lucas. (ECF No. 8 at 10.) She argues that Ms. Lucas "noted [Claimant] was nervous in crowds, shaky, avoided people, and that while she did chores[,] they were limited and based upon how she felt." (*Id.*) The ALJ accurately summarized Ms. Lucas's findings in his decision. (Tr. at 28; *see id.* at 748–52.) However, the ALJ stated, "Notably, while [Claimant] reported to be very physically limited to the psychological consulting expert, from a mental standpoint her activities of daily living were fairly unimpaired." (*Id.* at 33.) This is consistent with Ms. Lucas's overall findings, which are normal except that Claimant "appeared depressed." (*Id.* at 750–51.) More importantly, it is consistent with the observations of Claimant's treating physicians, as the ALJ explained: "When a claimant alleges significant mental symptoms, such as poor memory, concentration, and social functioning, the undersigned would expect that her treating practitioners would note abnormalities on mental status examinations. However, the treatment notes of her treating practitioners usually showed that [Claimant's] mental status was normal at appointments

except for routine findings, such as depressed mood and affect, which would not be expected to cause significant functional limitation.  The claimant generally had normal insight, judgment, concentration, and memory at appointments." (*Id.* at 33.)

Accordingly, the undersigned **FINDS** that the ALJ adequately explained why he rejected the portions of the record on which Claimant relies.

## IV.    CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Claimant's request for judgment on the pleadings (ECF No. 8), **GRANT** the Commissioner's request to affirm his decision (ECF No. 9), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable David A. Faber, Senior United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection.  Extension of this time period may be granted for good cause shown.  Copies of any objections shall be served on opposing parties, Senior District Judge Faber, and the undersigned Magistrate Judge.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals.  28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

Date:   July 23, 2019

Dwane L. Tinsley
United States Magistrate Judge